UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                        Plaintiff,

        v.

CHRISTOPHER EBERHARDT,

                        Defendant.
_____

REPORT & RECOMMENDATION

16-CR-6040CJS

## PRELIMINARY STATEMENT

By Order of Hon. Charles J. Siragusa, United States District Judge, dated May 10, 2016, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).

On May 10, 2016, the grand jury returned a ten-count indictment charging defendant Christopher Eberhardt ("Eberhardt") with seven counts of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A), one count of distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A), and two counts of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). (Docket # 16). Currently pending before this Court is a motion by Eberhardt to suppress statements.[1] (Docket # 20). For the reasons discussed below, I recommend that the district court deny Eberhardt's motion to suppress statements.

---

[1] Eberhardt filed omnibus motions seeking other forms of relief including, *inter alia*, *Brady* material, discovery and inspection, *Jencks* material, preservation of rough notes, and leave to file additional motions. (Docket # 20). Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on June 30, 2016. (Docket ## 22, 23).

## FACTUAL BACKGROUND

**I.  Eberhardt's Affidavit**

In support of his suppression motion, Eberhardt submitted an affidavit describing the alleged circumstances of statements he made to law enforcement officers on February 13, 2015. (Docket ## 20 at ¶¶ 9, 11; 20-1 at ¶ 2). According to Eberhardt, three men dressed in black approached him in a restaurant while he was dining. (*Id.*). Eberhardt noticed that all three men had firearms and, as they approached, one of the men said, "Watch this, I'm going to bounce his head off the counter." (*Id.*).

At that time, Eberhardt stood up, and the men introduced themselves as law enforcement officers. (*Id.*). According to Eberhardt, he twice asked the men to show him identification, but they refused, and one of the officers told Eberhardt to accompany them outside to discuss a laptop they had found. (*Id.*). One of the customers in the restaurant stated that the officers should display their identification, at which point one of the officers drew his firearm, switched off the safety, and pointed the gun at the customer. (*Id.*). He then pointed the gun at Eberhardt and told him he would be shot if he did not accompany the officers outside. (*Id.*).

Eberhardt followed the officers outside, where he was searched. (*Id.*). According to Eberhardt, his phone was seized, and he was questioned. (*Id.*). At no time was Eberhardt advised of his *Miranda* rights. (*Id.*). Eberhardt maintains that the officers ignored his "lack of maturity, education, and intelligence." (*Id.*). According to Eberhardt, he is not able to read or write well, and had an Individualized Education Program in high school. (*Id.*).

## II.    The Evidentiary Hearing

This Court conducted an evidentiary hearing concerning the circumstances surrounding statements made by Eberhardt. (Docket ## 37, 39).[2] During the hearing, the government offered testimony from Michael Dombek ("Dombek"), an agent with the Department of Homeland Security ("DHS").[3] (Tr. 3-4). Dombek testified that he had been employed by the DHS since 2003 and had participated in the investigation of Eberhardt. (*Id.*).

### A.    February 13, 2014 Interview

According to Dombek, on February 13, 2014, he and New York State Police Investigator Greg Schmitter ("Schmitter") interviewed Eberhardt outside his residence at 1372 Prospect Street, Willard, New York. (Tr. 4-5). They arrived in a state police vehicle at approximately 2:30 p.m. (Tr. 5-6). Dressed in civilian clothing, both had holstered firearms that were covered by their winter jackets. (Tr. 6-7). Dombek testified that their firearms remained holstered throughout the interview. (Tr. 7, 21).

After arriving at the residence, they knocked on the door, which was answered by Eberhardt's mother, Candace Eberhardt. (Tr. 7). They informed her that they were conducting an investigation and needed to speak to Eberhardt. (Tr. 7-8). Mrs. Eberhardt called him to the front door, and Eberhardt stepped outside. (*Id.*). Dombek and Schmitter informed him that they were conducting a child pornography investigation and had located a computer belonging to Eberhardt at the "Gayhart residence." (Tr. 8). They also indicated that they wanted to speak to Eberhardt about the computer. (*Id.*).

---

[2] The transcript of the evidentiary hearing shall be referred to as "Tr." (Docket # 39).

[3] On March 13, 2017, Eberhardt filed a motion seeking to reopen the suppression hearing. (Docket # 46). On May 15, 2017, counsel for Eberhardt informed the Court that Eberhardt no longer wished to present additional witness testimony. (Docket # 51). Accordingly, Eberhardt's motion to reopen the suppression hearing (**Docket # 46**), is **DENIED as WITHDRAWN**, and the matter is considered fully submitted as of May 16, 2017.

Eberhardt indicated that he did use the computer at the Gayhart residence, which belonged to a resident of that home, not to Eberhardt. (*Id.*). Mrs. Eberhardt, who was present for the entire interview, stated that although they had a computer at their residence, it was old and was not capable of being connected to the internet. (Tr. 9). Dombek and Schmitter asked to search the computer, and Mrs. Eberhardt responded that they would need a warrant. (*Id.*). The officers also asked Eberhardt for his phone number, and he declined to give it to them. (*Id.*). When asked whether he had any objection if the agents looked at the contents of the computer at the Gayhart residence, Eberhardt responded that they could look at that computer. (Tr. 9-10).

During the interview, neither Dombek nor Schmitter threatened Eberhardt or made him any promises. (Tr. 10). According to Dombek, Eberhardt was coherent, appeared to understand the questions, and did not display any signs of mental deficits or impairments. (Tr. 10-11). Dombek testified that Eberhardt was not advised of his *Miranda* rights during the interview. (Tr. 30).

### B. February 13, 2015 Interview

On February 13, 2015, law enforcement agents went to Eberhardt's residence to execute a search warrant for the premises and for Eberhardt's person. (Tr. 11-12). Eberhardt was not home, but New York State Police Investigator Crouch ("Crouch") observed Eberhardt's car at a diner that Eberhardt was known to frequent, located in Waterloo, New York, approximately twenty minutes from Eberhardt's residence. (*Id.*).

Dombek and Schmitter drove to the diner and met with Crouch. (Tr. 13). According to Dombek, he and Schmitter arrived at approximately 10:30 a.m. (*Id.*). Dombek, Schmitter and Crouch were each armed, although Dombek recalled that their weapons were

covered by their jackets. (Tr. 13-14). All of the agents were wearing jackets that identified them as law enforcement officers. (*Id.*).

Dombek, Crouch and Schmitter entered the diner at the same time and approached Eberhardt, who was sitting on a stool at the counter. (Tr. 14). Other customers were seated on both sides of Eberhardt. (Tr. 15). According to Dombek, Eberhardt recognized them, and Dombek informed Eberhardt that they were continuing their investigation and that they would like to speak to him outside. (Tr. 15, 21-22). Eberhardt inquired as to why they were there, and they responded that they would tell him everything once they were outside. (Tr. 15).

According to Dombek, at no time did any of them indicate that they intended to "bounce [Eberhardt's] head off the counter." (*Id.*). Nor did he or the other agents draw their firearms or point them at Eberhardt or the other customers. (Tr. 16, 25). Dombek also denied that anyone asked to see his identification. (Tr. 31). According to Dombek, Eberhardt put on his coat and willingly accompanied them outside. (Tr. 16, 23).

After they got outside, Eberhardt was informed of the ongoing investigation, that the officers had a warrant to search his person, and that they needed to search him for evidence related to the investigation. (*Id.*). Eberhardt was advised that he was not under arrest. (Tr. 16, 27-28). At that point, Schmitter searched Eberhardt and located a cellphone, keys, and a wallet. (Tr. 17). The wallet and keys were returned to Eberhardt, but the phone was seized. (*Id.*).

After the search was completed, the officers informed Eberhardt that the investigation was ongoing and that they had also executed a search warrant at his residence. (Tr. 17, 23). They asked if they could speak further with him. (*Id.*). Eberhardt agreed, and the group moved across the street to a parking lot where Dombek's vehicle was located. (Tr. 18, 23-24). Because it was very cold out, Dombek suggested that they continue the conversation in

5

his car, but Eberhardt declined and stated that he distrusted law enforcement and would be more comfortable outside the car. (Tr. 18). Eberhardt was again advised that he was not under arrest. (Tr. 16, 27-28).

Eberhardt provided additional information in response to questioning by Dombek and Schmitter. (Tr. 18). At the conclusion of the interview, Eberhardt was asked to provide a written statement, which he declined. (Tr. 19, 26). At that point, Eberhardt was told that he was free to leave, and Eberhardt left the area in his vehicle. (Tr. 19-20). Dombek, Schmitter and Crouch returned to the state police barracks. (*Id.*).

According to Dombek, the interview lasted approximately ten minutes. (Tr. 19, 25). At no time during the interview did Eberhardt indicate that he wished to stop speaking with them or that he wanted an attorney. (Tr. 18). Dombek testified that they did not threaten Eberhardt or advise him to cooperate, and he appeared to be coherent and not mentally impaired. (Tr. 20, 25-26). According to Dombek, they did not ask Eberhardt whether he was able to read or write, nor did they advise him of his *Miranda* rights. (Tr. 26-27, 30). Dombek testified that, based upon information he learned during the investigation, he believed that Eberhardt could read and write. (Tr. 30, 32).

**REPORT & RECOMMENDATION**

Eberhardt seeks to suppress the oral statements he made to Dombek and Schmitter.[4] (Docket # 20 at ¶¶ 5-12). Eberhardt contends that his statements were obtained in violation of the Fifth Amendment because he was subjected to custodial interrogations without

---

[4] Although Eberhardt's motion papers do not make clear whether his motion to suppress pertains to the statements he made on February 13, 2014, in addition to those he made on February 13, 2015, this Court will construe his motion expansively to pertain to both interviews.

6

being advised of his *Miranda* rights.  (*Id.*).  He also maintains that the circumstances of his interrogations rendered his statements involuntary.  (*Id.*).

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  As the Second Circuit has stated:

> [I]nterrogation consists of express questioning or its functional equivalent. . . . [T]he overarching "custody" question is whether a reasonable person in the suspect's position would have understood [himself] to be subjected to restraints comparable to those associated with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148, 153 (2d Cir. 2011) (internal quotations and brackets omitted).

In determining whether a defendant was in custody, a court must undertake a two-part analysis.  First, the court must ask "whether a reasonable person would have thought he was free to leave the police encounter at issue."  *United States v. Newton*, 369 F.3d 659, 672 (2d Cir.), *cert. denied*, 125 S. Ct. 371 (2004).  If the answer is affirmative, the inquiry concludes.  *Id.*  If, however, the reasonable person would not have felt free to leave, the court must then proceed to the second step of the analysis and determine whether, in addition to feeling not free to leave, the "reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest."  *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  "Only if the answer to this second question is yes was the person 'in custody for

practical purposes' and 'entitled to the full panoply of protections prescribed by *Miranda*.'" *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)); *see United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992) ("[d]ecisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave"). Thus, "[a]lthough both elements are required, the second is the ultimate inquiry because a free-to-leave inquiry reveals only whether the person questioned was seized[,] . . . a necessary, but not sufficient, condition [of custody]." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016) (internal quotations omitted).

> Considerations relevant to the custody analysis include:
>
> (1) "the interrogation's duration"; (2) "its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; and (6) "whether officers told the suspect he was free to leave or under suspicion."

*Id.* (quoting *United States v. FNU LNU*, 653 F.3d at 153).

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003 (1993). In evaluating the totality of the circumstances, the court must assess: "(1) the characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law enforcement officials." *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131

8

S. Ct. 969 (2011).  Where circumstances suggest evidence of "brutality, [p]sychological duress, threats, [or] unduly prolonged interrogation," statements will be deemed involuntary.  *United States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v. Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010), *cert. denied*, 131 S. Ct. 954 (2011)), *cert. denied*, 133 S. Ct. 48 (2012).

On the basis of the testimony offered by Dombek, which I find credible, I conclude that Eberhardt was not in custody during either of his encounters with law enforcement.  During the first encounter, on February 13, 2014, Dombek and Schmitter approached Eberhardt's residence in plain clothes and did not display their weapons.  They knocked on the door, spoke with Eberhardt's mother, and indicated they needed to speak with Eberhardt.  They informed Eberhardt of the purpose of their visit and questioned him in the presence of his mother.

The record demonstrates that Eberhardt agreed to speak with Dombek and Schmitter and did so in the presence of his mother outside his home.  He was not handcuffed, searched, threatened, or coerced by Dombek or Schmitter.  Further, the evidence demonstrates that the encounter was relatively brief and that Eberhardt was calm and coherent.  Eberhardt and his mother denied the agents' requests for Eberhardt's phone number and to search his home computer.  When the interview concluded, Eberhardt was not arrested and was free to return to his house.  Based on the totality of the circumstances, I find that Eberhardt was not in custody, and *Miranda* warnings therefore were not required.  *See United States v. Faux*, 828 F.3d at 135-36 ("courts rarely conclude, absent a formal arrest, that a suspect questioned in [his] own home is 'in custody'"); *United States v. Newton*, 369 F.3d at 675 ("absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial").

I reach the same conclusion with respect to the February 13, 2015 encounter. As an initial matter, I note that Eberhardt and Dombek have offered sharply conflicting versions of the encounter – Dombek through sworn testimony at the hearing and Eberhardt through a sworn affidavit included in his motion papers. "Although[] the [c]ourt may consider defendant's affidavit, it is a poor substitute for live testimony, which is the subject of cross-examination." *United States v. Nicholson*, 2016 WL 3970927, *3 (W.D.N.Y. 2016); *United States v. Riedman*, 2014 WL 713552, *16 (W.D.N.Y. 2014) (according defendant's affidavit consideration but less weight than conflicting testimony of government witnesses who were subject to cross-examination) (collecting cases). Having carefully evaluated Dombek's testimony and his demeanor as a witness, I find that Dombek credibly testified about the circumstances of the February 13, 2015 interview.[5]

Specifically, I find that none of the law enforcement officers drew their weapons, refused to provide identification, threatened Eberhardt, or demanded that he accompany them outside. Rather, I find that Dombek, Schmitter and Crouch approached Eberhardt with their guns holstered and asked him to accompany them outside. I further find that Eberhardt voluntarily accompanied them outside without asking them to produce identification. After they went outside the restaurant, Eberhardt was informed that he was not under arrest and would be searched pursuant to a warrant.

After the search was completed, Eberhardt voluntarily accompanied the agents across the street and continued to speak with them. He was again informed that he was not under arrest. Eberhardt answered the agents' questions, and the interview ended after Eberhardt declined to provide a written statement. Eberhardt left the restaurant in his own vehicle.

---

[5] In reaching this conclusion, the Court draws no adverse inference against Eberhardt based upon his decision not to testify. *See United States v. Hill*, 2009 WL 922475, *4 (W.D.N.Y.), *report and recommendation adopted*, 2009 WL 928322 (W.D.N.Y. 2009).

Throughout the interview, Eberhardt was cooperative and coherent and was not threatened or promised anything to induce his statements. The entire interview, including the search of his person, lasted approximately ten minutes. Based upon the totality of the circumstances, I conclude that a reasonable person in Eberhardt's position would have felt that he was free to leave. Accordingly, I find that Eberhardt was not in custody and that *Miranda* warnings were not required.

Finally, I conclude that Dombek's credible testimony establishes that Eberhardt's statements were voluntary and not coerced. During both encounters, Eberhardt willingly answered questions and never requested an attorney or that the questioning cease. At no time did the officers display their weapons or make any threats or promises or use any physical force to induce Eberhardt to talk. Both interviews were relatively brief – the longest of the two lasting approximately ten minutes.

Although Eberhardt maintains that he lacks maturity, education, intelligence, and the ability to read and write well, Dombek testified that Eberhardt was coherent, did not display any evident mental impairments, and appeared to understand the questioning during both interviews. Further, during both encounters Eberhardt denied various requests made by Dombek and the state investigators. During the first encounter, Eberhardt denied their request for his phone number. During the second encounter, Eberhardt denied their request to provide a written statement. That Eberhardt chose to deny those requests suggests that the circumstances of the interviews were not so coercive as to overbear Eberhardt's will. *See United States v. Bailey*, 2016 WL 6995067, *36 (W.D.N.Y. 2016) ("[f]urther, [defendant] refused the investigators' request that he acknowledge his waiver by signing the rights card, suggesting that the conduct of

11

the interview was not so coercive that [defendant] was unable to exercise his own free will"). Considering the totality of the circumstances, I find that Eberhardt's statements were voluntary.

## CONCLUSION

For the reasons stated above, I recommend that Eberhardt's motion to suppress statements (**Docket # 20**) be **DENIED**. As stated above, Eberhardt's motion to reopen the suppression hearing **(Docket # 46)** is **DENIED as WITHDRAWN**.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
June 8, 2017

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[6]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                                   *s/Marian W. Payson*
                                                 MARIAN W. PAYSON
                                            United States Magistrate Judge

Dated: Rochester, New York
         June 8, 2017

---

[6] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).